**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DIVISION OF INDIANA**
**NEW ALBANY DIVISION**

| | | |
|---|---|---|
| **GLEN ANDREW RUNGE,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Cause No. 4:09-CV-0130SEB-WGH** |
| | ) | |
| **STANLEY FASTENING SYSTEMS, L.P., A DIVISION OF STANLEY-BOSTITCH, INC.,** | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT ALI M. SADEGH**

COMES NOW Defendant, STANLEY FASTENING SYSTEMS, L.P., ("Stanley"), by and through its undersigned counsel, and submits this Memorandum in Support of its Motion to Preclude the Testimony of Plaintiff's Expert Ali M. Sadegh. As grounds for this Motion, Defendant states as follows:

## INTRODUCTION

Plaintiff has disclosed Ali M. Sadegh ("Sadegh") as a retained expert who will testify regarding the "bio-mechanics" of how plaintiff's injury occurred. Sadegh holds a Ph.D. in mechanical engineering and holds himself out as an "accident reconstructionist." For the reasons set forth below, Sadegh should be precluded from testifying at trial because his testimony does not meet the requirements of Rule 702, *Fed. R. Civ. P.*, in that it is: (a) not based on sufficient, reliable facts or data, (b) is not the product of reliable principle and methods, and (c) consists of impermissible speculation. More specifically, Sadegh's opinions are inadmissible under the standards set forth in Daubert and its progeny because, (1) he admittedly relies heavily on the demonstrably impaired and unreliable memory of the

plaintiff, (2) there is insufficient physical evidence on which to base an accident reconstruction, and (3) Sadegh performed no testing to validate his theories and opinions. Consequently, Sadegh's testimony amounts to nothing more than impermissible speculation, and should be excluded.

## RELEVANT FACTS

This lawsuit arises from an incident which took place on August 30, 2007. Plaintiff alleges that he accidentally shot himself in the chest with a pneumatic nail gun manufactured by defendant. (Compl. ¶¶ 10-13). The Complaint alleges that the air hose connecting the nail gun to the compressor snagged on something in the barn, causing him to fall, at which time the nail gun discharged a nail into his heart. (Compl. ¶¶ 10-13). The Complaint alleges that the nail gun was defective in manufacture, in design, and for failure to warn. (Id. ¶ 17).

### THE STANLEY NAIL GUN

The incident nail gun is a Model N80SB-1 pneumatic stick framing nailer. The incident nail gun was a "contact trip" nailer, *i.e.*, it fired a nail whenever the trigger and the nose of the gun were both depressed at the same time. Plaintiff alleges the contact trip nailer is unreasonably dangerous because an alternative design, known as a "sequential trip", was known and available. A sequential trip nailer fires a nail only when the trigger is depressed ***after*** the nose of the nailer is depressed. Plaintiff alleges that his accident would not have occurred had the nailer in question been manufactured solely[1] as a sequential trip nailer.

The incident nail gun was purchased by plaintiff's father, Glen Runge, in April of 1998, over five years before the incident. (Compl. ¶ 7). Glen and Andy used the nailer on

[1] The nailer in issue could be converted from a contact trip to a sequential trip nailer, and vice versa, by use of a conversion kit.

many jobs after that (Glen Runge Dep. 105-06).[2] Glen had owned several other pneumatic nail guns, including coil roofing nailers, and a Stanley-Bostitch finish nailer with a sequential trip mechanism that he purchased in approximately 2000 (Dep. 72). Glen testified that pneumatic nailers are faster and more productive (Dep. 97). Glen believed that Andy, based on his experience and knowledge of the nail gun, was, by far, the best operator of the gun (Dep. 93). Andy read the manual more thoroughly than Glen did (Dep. 94). Glen did not let anyone other than he or Andy use the nail gun, because he thought it was too dangerous (Dep. 93). Andy also testified that he had used the nail gun for years prior to his accident, and that he knew there were many ways to get hurt with it, including driving a nail into his body (Andy Runge Dep. 26-27, 34-35).

**PLAINTIFF'S INJURY AND MEMORY IMPAIRMENT**

A. Lance Trexler Testimony. Plaintiff retained Lance Trexler ("Trexler"), a neuropsychologist, as an expert witness on behalf of plaintiff. (Dep. 5). Trexler reviewed plaintiff's medical records, examined plaintiff, and administered neuropsychological testing to measure plaintiff's cognitive and memory impairment. In his "Neuropsychological Examination" report (Ex. 11), on page 1, Trexler described the incident in which plaintiff was injured as follows:

> He was apparently working on a rooftop when he accidentally was injured when a nail gun discharged a nail into his heart. The patient subsequently fell off the roof and apparently was somehow stabbed by a 6 to 8 inch knife in the same anatomical location as the nail gun wound.

[2] Unless otherwise indicated, references to "Dep." are to the deposition of the witness being discussed and all such excerpts from these depositions are attached hereto, along with any exhibits mentioned.

Trexler testified that plaintiff suffered, among other things, an anoxic brain injury, a condition with which Trexler has experience. (Dep. 9-10, 84). This condition is caused by oxygen deprivation to the brain and adversely impacts memory. (Dep. 9-13).

Trexler testified that since his injury, plaintiff's memory is "quite impaired" so that "he would be able to give you a very limited history of what transpired since that time [*i.e.*, the time of the accident]." (Dep. 31-33). In his report, (Ex. 11, attached hereto), Trexler found that plaintiff had a "severely" impaired memory and that plaintiff himself reported that "memory since his injury is 'difficult'". This same report also found that plaintiff had "severe impairment of cognitive functions". (Ex. 11, pp. 2 and 4). Additionally, Trexler suggested that plaintiff's inconsistent articulation of the incident events could be the result of "confabulation", *i.e.* "when a patient does have memory impairment they can have what's called confabulation which is when there's a hole in memory, the brain doesn't like that, and so the brain goes, 'Oh, I'll grab some data over here, and I'll dump it into this hole,' so at least then there's information there, even though it may not be accurate." (Dep. 68). Trexler acknowledged it is possible that as to plaintiff's memory of the incident, "if he's heard others talk about how the accident could have happened, he can adopt those as part of his own memory." (Dep. 69).

This phenomenon of confabulation is especially significant in this case, because Trexler testified that plaintiff could not respond to open-ended questions, and that "cues" were required to help him answer questions:

> "A. So, so – my experience with Andy was, was you would ask him a question and you – what you would get back really didn't pertain to the nature of the question asked.
> Q. Okay.
> A. And, so, it was vacuous – his responses.
> * * * *

Q. In other words – and I'll try and put this in sort of my terms. If you ask Andy to provide an open-ended narrative like, what happened –
A. (Shaking head negatively)
Q. – he can't do that?
A. No, sir."

(Dep. 51-52).

Trexler testified that retrograde amnesia can certainly be a common symptom of anoxic brain injury. (Dep. 46). Trexler did no testing to determine whether Andy's description of the accident was consistent with the medical record, or with the objective evidence of his injuries. (Dep. 45). Although Andy reported having flashbacks of the accident, Trexler did not investigate whether these flashbacks wee historically accurate, because he was only concerned about how those flashbacks impacted Andy's psychological state, not their accuracy. (Dep. 49). Trexler has done nothing beyond his clinical interview with Any to verify the accuracy of his memory of the incident. (Dep. 57).

B. Plaintiff's Testimony Regarding the Incident. Plaintiff was alone at the time of the incident, and thus, is the only witness. Plaintiff was deposed by counsel for defendant on September 1, 2010. During his deposition, plaintiff experienced problems with his memory. For example, while plaintiff identified the nail gun, and remembered using it for "quite a few years" before his injury, he was not able to describe how to shoot a nail with it. (Dep. 25-27). He also recalled witnessing a number of nail gun accidents. (Dep. 28-32). Andy's father subsequently testified that Andy had never witnessed any such accidents. (Glen Runge Dep. 52). Andy also testified that he read the operator's manual for the nail gun, and that there were no safety instructions in the manual. (Dep. 33). (A copy of the operator's manual for this tool is attached as Ex. 9).

When asked specifically if he remembered the accident, Andy responded, "Sort of do", and asked for a break. (Dep. 36). When subsequently asked to describe the accident, plaintiff, consistent with Trexler's testimony that he was unable to respond to open-ended questions, merely responded: "Yeah, it was a bad accident. * * * The nail gun shot me in the heart." (Dep. 38). Asked what he intended to do with the nailer, he said: "Probably tried to help things out. I don't know." (Dep. 38). In an effort to get plaintiff's description of the accident, defense counsel asked a series of leading questions to which plaintiff typically answered "yes" or with another one or two word answer. (Dep. 38-46). This leading questioning by defense counsel disclosed the following accident scenario[3]: Plaintiff was working on his combine and was going to nail some wood blocks together to support the combine axle. The air hose from the compressor was already hooked to the nailer when he picked up the loaded nailer and carried it from one side of the barn to the other. He shot himself with the nailer and then fell to the ground[4]. The air hose caused him to fall after it got stuck on something. It wouldn't reach all the way over to the combine. When he fell he landed on top of the nailer and that's when it fired. His thumb was on the trigger as he was carrying the nailer over to the combine. (Dep. 38-45). Although not shown on the video of the deposition because the camera was focused only on plaintiff, defense counsel illustrated to plaintiff the scenario by pulling on the air hose with the nailer pointed directly at his chest after it got stuck in his attempt to free the stuck hose, thereby yanking the gun towards himself. Plaintiff agreed with this illustrated scenario. (Dep. 42).

---

[3] These leading questions by defense counsel were based on the allegations of the complaint, and a scenario of the accident that was given to defendant's counsel by plaintiff's counsel.

[4] Plaintiff initially says he shot himself ***before he fell to the ground*** (Dep. 39); but shortly thereafter, says he shot himself when he fell to the ground and the nailer hit the ground (Dep. 41-42).

Plaintiff's counsel then "cross" examined the plaintiff as to how the accident occurred. Plaintiff's counsel, through a series of leading questions and physical manipulations of plaintiff [5], to which objections were made, elicited testimony from plaintiff that he was holding the gun away from himself and not as previously described. (Dep. 61-62). Through a series of leading questions, plaintiff's counsel then had plaintiff testify that the gun twisted in his hand and then his thumb went on the trigger.[6] With more leading questions, counsel for plaintiff got plaintiff to say that as the nail gun twisted in his hand, he fell to the ground and the nozzle of the gun came into contact with his chest. With still more leading questions, the plaintiff then said at the time his body came into contact with the gun nozzle, his thumb came into contact with the trigger. (Dep. 63).

**ALI M. SADEGH'S OPINIONS**

Ali Sadegh ("Sadegh") prepared a Rule 26 report (Ex. 100, attached hereto) setting forth his opinions as to how he believes the incident occurred. Sadegh testified that he performed a full accident reconstruction in this case. (Dep. 32). He testified that plaintiff was unable to simply tell what happened because the accident happened fast, and would possibly be out of his memory. (Dep. 33). Sadegh admits that he relied on plaintiff to tell him about the accident, and that there was not enough physical evidence from which he could have done a reconstruction in the absence of plaintiff. (Dep. 34-36). Sadegh read neither the report or deposition testimony of Dr. Trexler, but agreed that he defers to Trexler as to whether plaintiff's memory was impaired. (Dep. 63-64).

---

[5] For the physical manipulations, *see* Dep. 61 and video of this portion of the deposition at the time shown on the video of 11:17:39 to 11:21:30 (copy of video to be provided to the Court.)

[6] This testimony was inconsistent with his direct testimony to counsel for Defendant when he testified he was carrying the gun over to the combine with his thumb on the trigger. (Dep. 42)

With regard to the accident, Sadegh opines that plaintiff was walking fast (4–5 mph) in his barn with the loaded nailer in his hand (hooked up to the air hose) when the hose "suddenly stuck in the U-shaped slot of the tractor-weight and wedged under the tire of the tractor located between the combine machine and the tractor-weight." (Ex. 100, p. 8 and Dep. 131). Sadegh opines that the "sudden pulling force caused him to lose his balance and he stumbled forward, flexing his knee and his upper body." (*Id.*) Sadegh adds that "[t]he magazine of the nail gun came in contact with Mr. Runge's right thigh causing the nail gun to rotate counterclockwise around his hand." (*Id.*) Sadegh concludes that: "In a pulling situation, and in contacting the magazine of the gun with Mr. Runge's thigh the nail gun can easily rotate about its center of gravity, i.e., the trigger point and about Mr. Runge's thumb would press the trigger." (*Id.*) Sadegh then adds the following to his opinions on pp. 8-9 of his Report, Ex. 100: "…when the air hose was stuck, the subject nail gun rotated in Mr. Runge's hand and turned inward. As Mr. Runge was falling down, his chest came in contact with the nose piece of the nail gun while the heavy end of the gun contacted the ground. This contact depressed the nose piece and actuated the nail gun, and drove a 3.5 inches [sic] nail into his chest… With a reasonable degree of biomechanics certainty, I believe that had Mr. Runge used a Sequential Trip safety trigger, this accident would have been avoided." (Ex. 100, p. 9).

Sadegh testified that accident reconstruction is "using physical and factual evidence in conjunction with mathematics and physics to determine how an accident occurred." Sadegh also agreed that it involves "the application of engineering principles and the scientific method to the analysis of factual information." (Dep. 61). Notwithstanding the application of scientific principles of physics and math, Sadegh admits that plaintiff "told me

exactly what happened, so I relied on that." (Dep. 127). When asked why plaintiff couldn't simply tell us what happened, Sadegh says it "perhaps is out of his either memory, or out of his – when you're in accident, let's put it this way, you're -- it happens so fast that you're not aware of all the other, let's say, parameters that contributed to this accident." (Dep. 33).

There are numerous instances in which Sadegh acknowledges a lack of physical evidence to support his conclusions and opinions. For example, Sadegh opines that the air hose got stuck in the notch of a tractor weight in the barn. (Ex. 100, p. 2). He admits, however, that he was not able to find any witness marks on the air hose that would have shown that it had been stuck in the tractor weight. (Dep. 98-99). He does not know if anyone witnessed the hose struck in the tractor weight after the accident. (Dep. 86). Glen Runge testified that he did not know if the hose was stuck in that notch when he went to the barn after the accident. (Glen Runge Dep. 166-67). The sole basis for this conclusion, that the hose was stuck in the notch of the tractor weight, was Andy telling Dr. Sadegh that it happened, (Sadegh Dep. 98), and Sadegh's conclusion that it was "feasible" or "possible". (Dep. 99).

Similarly, Sadegh found no physical evidence to confirm the location where he opines that Andy fell on the nail gun. (Dep. 89, 108). There were no witness marks on the ground in that area, and Sadegh found no blood in that area. (Dep. 108). Sadegh writes in his report that plaintiff was going to nail together wood blocks to support the combine. (Ex. 100, p. 2). Although Sadegh was told that the accident site had been preserved (Dep. 83), Sadegh admits that he saw no such blocks during his inspections of the accident site. (Dep. 92-93). Although Sadegh opines that the magazine of the nail gun struck plaintiff's right thigh, the medical records reflected no wounds to plaintiff's right thigh. (Dep. 124). Nor did

the medical records reflect any wounds from a fall on the gravel floor of the barn. (Dep. 140-41).

Sadegh also states in his expert report (Ex. 100, p. 6) that when the body is subjected to a sudden restraining force or pulling rearward, "the natural reaction is to flex the upper body and stumble." When asked for a source of this statement, Sadegh simply said "you can just find it in almost any book", but he was not able to identify any particular authority for this statement. (Dep. 139-140). Sadegh admits that he did no testing to support his opinions. (Dep. 55, 131). Although Sadegh admitted there were computer modeling software packages available that could be used to reconstruct this type of accident, he attempted no such computer modeling. It would have been very difficult and expensive to do. (Dep. 48-50, 50-55).

**THE EXPERT REPORT OF GARY DEEGEAR[7]**

Dr. Gary Deegear is a medical doctor with almost 16 years of training and experience in both accident reconstruction and injury biomechanics and has trained other professionals in these areas. Dr. Deegear was retained by Stanley, and has prepared and submitted a Rule 26 report in this case. Dr. Deegear reviewed the report and deposition testimony of Ali Sadegh, and concluded, "[t]here is insufficient physical or otherwise reliable evidence on which to base a scientifically valid conclusion regarding the manner in which the subject incident occurred." (Ex. 114, p. 3, Opinion #3). Referencing the textbook, <u>Accidental Falls</u>, by Dr. Alvin S. Hyde, (attached hereto as Exhibit A), Deegear wrote that "[n]ormal human reflexes in a fall are inconsistent with any motion by Mr. Runge that would have brought the nailer into contact with his chest. Furthermore, normal human reflexes, even as

[7] Dr. Deegear's Report and C.V. is attached hereto as Exhibit 114.

demonstrated by Ali Sadegh in his deposition, would not cause a trip/stumble & fall had the hose been trapped as postulated." (Ex. 114, p. 3, Opinion #5)

**THE EXPERT REPORT OF GLENN VALLEE**[8]

Dr. Vallee, retained by Stanley, is a professional engineer holding a Ph.D. in Mechanical Engineering with over 25 years experience using pneumatic nailers. Among other documents, Dr. Vallee reviewed the deposition and reports of Dr. Sadegh. Dr. Vallee's Report states: "It is impossible to determine, using valid, scientific method, the sequence of events which led to this accident based on the available physical evidence in this case. There were no witnesses to the accident, and the only account of the events which led to the accident was provided by Andy Runge in his deposition testimony. This testimony is lacking in detail and often conflicting in its content." (Ex. 116, pp. 11-12, Opinion #8) Dr. Vallee's Report goes on to state: "The reconstruction of the accident presented by Mr. Sadegh is inconsistent with the fundamental principles of physics which govern the motion of all bodies in the universe." (Ex. 116, pp. 12-13, Opinion #11)

## APPLICABLE LAW

The decision to permit or exclude expert testimony is left to the sound discretion of the Court. Bradley v. Brown, 42 F.3d 434, 436-37 (7th Cir. 1994). "The burden of showing an expert's testimony to be relevant and reliable is with the proponent of the evidence." Bickel v. Pfizer, Inc., 431 F.Supp. 2d 918, 921 (N.D. Ind. 2006). The admissibility of expert testimony is governed by the framework set out in Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993). The party seeking to have the expert testimony admitted bears the burden of demonstrating its admissibility by a preponderance of the evidence. TRW Title Insurance Co. v. Security Union Title Insurance Co., 890 F.Supp.

[8] Dr. Vallee's Report and C.V. is attached hereto as Exhibit 116.

756, 758 (N.D. Ill. 1995); United States v. Monteiro, 407 F.Supp.2d 351, 356 (D. Mass. 2006); United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) ("The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion.").

Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The inquiry envisioned by Rule 702 is a flexible one in which the federal judges perform a "gatekeeping role" to ensure that speculative and unreliable opinions do not reach the jury. *Daubert*, 509 U.S. at 594-95, 597 ("Its [Rule 702's] overarching subject is the scientific validity and thus evidentiary relevance and reliability of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.").

*Daubert* noted several factors judges may consider in determining whether to admit expert scientific testimony under Rule 702: whether an expert's theory or technique can be and has been tested; whether the theory or technique has been subjected to peer review and publication; whether the known or potential rate of error is acceptable; and whether the expert's theory or technique is generally acceptable in the scientific community. 509 U.S. 593-94. "...[U]nder the Rules, the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, *but reliable.*" (*Daubert*. at 589, emphasis added.) *Daubert* also noted that "[f]aced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset . . . whether the expert is

proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." (*Daubert* at 593.)

Six years after handing down the decision in *Daubert*, the Supreme Court held that the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony. * * * Too much depends upon the particular circumstances of the particular case at issue." Kumho Tire Company, Ltd. V. Carmichael, 526 U.S. 137, 150. *Kumho* went on to say, however, that the "trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony." (*Id.* at 152) *Kumho* reaffirmed that the "objective of that [gatekeeping] requirement is to ensure the reliability and relevance of expert testimony." (*Id.*)

*Daubert* sets out a non-exclusive list of guideposts that a court should consider in its analysis of the admissibility of expert opinion: 1) whether the theory can be and has been verified by the scientific method through testing; 2) whether the theory has been subjected to peer review; 3) the known or potential rate of error; and 4) the general acceptance of the theory in the scientific community. Chapman v. Maytag Corp., 297 F.3d 682, 687 (7th Cir. 2002) See also, Ball v. Versar, Inc., 454 F.Supp.2d 783, 799 (S.D. Ind. 2006). Rule 702 assigns to the trial judge the task of ensuring that an expert's testimony rests on a reliable foundation. *Daubert*, 509 U.S. at 597. The Seventh Circuit has provided guidance on how to determine reliability: "[T]he court is to determine whether the expert is qualified in the relevant field and . . . examine the methodology the expert used in reaching his conclusions."

Smith v. Ford Motor Co., 215 F.3d 713, 718 (7th Cir. 2000). Even if an expert is qualified to testify on a particular subject, the court must also "focus on an examination of the expert's methodology." Id. at 718. Accordingly, an expert's work is admissible only when (1) it is reasoned, (2) it uses the methods of the discipline, and (3) it is founded upon data. Lang v. Kohl's Food Stores, Inc., 217 F.3d 919, 924 (7th Cir. 2000). "Talking off the cuff - deploying neither data or analysis - is not an acceptable methodology." Ibid. It is well settled that "the focus must be solely on principles and methodology, not on the conclusions they generate." Cummins v. Lyle Indus., 93 F.3d 362, 367-68 (7th Cir. 1996).

Finally, courts have repeatedly emphasized that the "subjective belief or unsupported speculation" of an expert should never be admitted. O'Connor v. Comm. Edison Co., 13 F.3d 1090, 1106 (7th Cir. 1994). "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." Gen. Elec. v. Joiner, 522 U.S. 136, 146 (1997). For this reason, "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." Zenith Elec. Corp. v. WH-T Broad Corp., 395 F.3d 416, 419 (7th Cir. 2005).

## ARGUMENT

Applying the relevant case law to the facts and testimony in this matter requires that Mr. Sadegh should be precluded from offering expert testimony in this matter. Sadegh's opinions are not based on sound methodology, in that he relies almost exclusively on the impaired, unreliable and inconsistent recollection of the plaintiff and not on the application of valid scientific methods to physical evidence in the case. Absent sufficient physical evidence

to perform a valid accident reconstruction, Sadegh's opinions are mere speculation, and should be excluded.

A. Sadegh's Opinions Are Not Reliable Because They Are Not Based on Sufficient Facts or Data. Rule 702 requires the proffered expert opinion to be "based on sufficient facts or data." Consistent with this requirement, *Daubert* requires that any expert opinion adduced must be *reliable*. *Daubert*, 509 U.S. at 589. Sadegh admits that in forming his opinions, he relied on plaintiff's testimony as to "exactly what happened". (Dep. 127). Sadegh further admits that without plaintiff's statement of how this accident occurred, it would be "hard" to reconstruct this accident. (Dep. 35).

Sadegh admits he did no testing to reconstruct how this accident happened, or to validate his opinions. (Dep. 55, 131). He did not employ any computer modeling that is available to help reconstruct accidents[9]. He testified that would be both very difficult and very expensive. (Dep. 48-50, 50-55). While Sadegh testified that accident reconstruction is "using physical and factual evidence with mathematics and physics to determine how an accident occurred", his testimony shows that: a) he relied on the highly questionable (*i.e.*, unreliable) factual data from plaintiff who has severely impaired memory of the accident[10] and gave contradictory versions of what happened[11], and whose own expert, Dr. Trexler,

---

[9] Accident reconstruction modeling software is available in a number of software products, including MAthematical DYnamic MOdels (1999). (MADYMO(TM) multibody dynamics software. MADYMO has a database of dummy models which makes it very suitable for reconstructing accidents involving humans. *See,* excerpt from *Computer Methods in Biomechanics and Biomedical Engineering*, Vol. 9, No. 6, December, 2006 at p. 3 of 16, attached hereto as Exhibit B.

[10] Trexler Dep. 31-33, Ex. 11, pp. 2, 4.

[11] See, supra, at 6-7.

testified is not competent[12]; and b) he offered no data or calculations to support his claim that he reconstructed the details of this accident using principles of mathematics and physics[13].

When questioned about the source of his statement that when the body is subjected to a sudden restraining force or pulling rearward, "the natural reaction is to flex the upper body and stumble", he could not identify any authoritative source, other than to say "you can find it in almost any book."[14] (Dep. 140). Sadegh also admitted he could find nothing in the medical records consistent with plaintiff's description of his fall to the ground. (Dep. 141).

In effect, what Sadegh did was to take an unreliable version of the accident that plaintiff's counsel elicited from plaintiff with leading questions, assumed that this version was an accurate statement of what occurred, and then made an effort to describe the details of how that version could possibly account for plaintiff's falling and simultaneously turning the nail gun into his chest and firing it. This is pure speculation and does not constitute reliable evidence based on sufficient facts or data. In short, Sadegh's opinions are inadmissible because they are not based on sufficient facts or data to make them reliable.

Federal courts have not hesitated to exercise their gatekeeping function by sustaining *Daubert* motions to preclude opinion testimony from accident reconstruction experts where the expert had insufficient factual information to scientifically reconstruct the accident. *See*, for example, J.B. Hunt Transport, Inc. v. General Motors Corp., 243 F.3d 441, 443 (8th Cir.

---

[12] Trexler Dep. 80.

[13] For example, there are five factors that define and determine stance stability: 1) the weight of the body, 2) the height of the Center of Gravity of the body above the base of support, 3) the size of the base of support, 4) the relative motion between the Center of Gravity and the support base, and 5) the location of a plumb line from the Center of Gravity (termed the "gravity line"); i.e., whether or not the gravity line lies within or outside of the support base. Accidental Falls, by Alvin S. Hyde, Ph.D., M.D., excerpts of which are attached hereto as Exhibit A and referenced in the Degear Report. Sadegh's Report makes no effort to apply these factors in any scientific fashion whatsoever.

[14] Without knowing a lot of other factors (*e.g.*, size, weight, velocity, direction of travel, etc.), it would seem difficult, if not impossible, to state categorically that "the natural reaction is to flex the upper body and stumble" under the circumstance of this accident.

2001) (precluding testimony of an accident reconstruction expert where he had insufficient information to scientifically reconstruct the accident). Likewise, federal courts have not hesitated to preclude expert testimony where there is a lack of any testing. See, for example, Dhillon v. Crown Controls Corp., 269 F.3d 865, 869 (7th Cir. 2001) ("We could identify a number of problems with the testimony these [expert] witnesses were prepared to offer, but the most glaring among them is the lack of testing…".) Federal courts have also rejected biomechanical expert testimony where, like here, the expert's opinion is based on unsupported and unscientifically determined factual information. Reali v. Mazda Motor of America, Inc., 106 F. Supp.2d 75, 77-78 (D. Me. 2000) ("[The expert] derived the 12 m.p.h. figure in large part from eyeballing accident photographs. [Omitting citation]. Reali [the plaintiff] has produced no testimony or record evidence suggesting that this is an acceptable way to determine Delta V. Consequently, I find the 12 m.p.h. figure unreliable.") Similarly, in the instant case, plaintiff has offered no evidence that Sadegh's reliance on an unreliable, brain injured, and memory impaired plaintiff, coupled with Sadegh's speculation on how mechanically this accident might have occurred, is either justified or scientific.

B. Sadegh's Opinions Are Not the Product of Reliable Principles and Methods.

Nowhere in his deposition testimony or in his Report (Ex. 100) does Sadegh identify the principles and/or methods he applied to determine that this accident occurred in the manner he claims in his Report. There are no authorities cited in his Report, there are no calculations made in his Report, and despite his statement that "accident reconstruction" involves the application of mathematics and physics to the known factual evidence, there is no application of mathematics or physics shown in Sadegh's report.

To the contrary, Sadegh admits that plaintiff told him "exactly what happened" and he simply relied on that. (Dep. 127). If Sadegh is simply relying on what plaintiff said as to how this accident occurred, there is no need for his "expert opinion" to reconstruct the accident. See Dhillon v. Crown Controls, Inc., 269 F.3d at 871 where the Court said: " 'An expert . . . must testify to something more than what is 'obvious to the layperson' in order to be of any particular assistance to the jury'." Since Sadegh is relying on the plaintiff's description of how the accident happened, his role as an accident reconstruction expert is unnecessary and not helpful to the jury.

Even ignoring the unreliability of plaintiff's versions of the accident due to his brain injury and severe memory impairment, Sadegh does not take even these unreliable "facts" and apply any articulated scientific or technical knowledge to them to support his opinions. There is a complete lack of any attempt to apply known and accepted scientific/technical knowledge to the "facts".

Similarly, Sadegh does not explain why the different version of the accident given to counsel for defendant[15] was not also a feasible explanation of how the accident occurred. The failure to exclude other potential causes of the accident can result in preclusion of that expert's testimony. See, Brown v. Parker-Hannifin Corp., 919 F.2d 308, 312 (5th Cir. 1990) where the court refused to admit the testimony of an expert on the cause of the accident because the expert failed to exclude other potential causes. ("While either of [the theories expressed by the expert] are possibilities, other theories explain the failure equally well. … Without some basis to establish that one of his theories is the most likely cause of the failure on this occasion, his testimony amounts to speculation and is of no assistance to the jury.")

---

[15] That he was pulling the nail gun pointed directly towards himself in an effort to free the air hose. *See supra*, at pp. 6-7.

See also, Diaz v. Johnson Matthey, Inc., 893 F.Supp. 358, 376 (D.N.J. 1995) (holding expert opinion on causation unreliable where the expert "ignores or is unable to satisfactorily discount" alternate causes and "did little, if anything, 'to rule out alternative causes.'")

Applying just the non-exclusive list of guideposts set out in *Daubert* is further illustration of the inadmissibility of Sadegh's opinions: 1) Has (or can) the "theory" be verified by the scientific method through testing? Sadegh's opinions cannot be and have not been verified by the scientific method through testing as he admitted he did no testing and his opinions do not articulate any scientific/technical calculations or theories; 2) Has the "theory" been subject to peer review? Sadegh's "theory" has not been subjected to peer review as his opinion does not even articulate or apply any theory; 3) What is the known or potential rate of error? There is no known or potential rate of error in Sadegh's opinions as they are not predicated on anything other than an assumption that one of plaintiff's versions of how this accident occurred is correct; and 4) Is there general acceptance of the theory in the scientific community? There is no "general acceptance" of Sadegh's "theory" in the scientific community as his opinions do not even articulate any scientific/technical theory, but rather just assume the accuracy of one version given by plaintiff of how this accident occurred. In sum, Sadegh's opinion is nothing more than an assumption that plaintiff can accurately recall what happened, coupled with Sadegh's speculation of how that version might have physically been possible. Such testimony fails to meet the requirements of Federal Rule 702 and the principles articulated in *Daubert.* It is nothing more than an attempt to prop up the unreliable memory and testimony of plaintiff with a false aura of science. Sadegh's unreliable opinions cannot, however, save plaintiff's unreliable memory.

Finally, Defendant directs the Court to the opinion in Snoznik v. Jeld-Wen, Inc., 2010 WL 1924483 (W.D.N.C. 2010) (copy attached as Exhibit C), which is particularly relevant here, due to its factual similarity to the present case. In *Snoznik*, plaintiffs brought product liability claims against the manufacturer of a casement window, seeking to recover for injuries suffered by the plaintiff when he fell from a second story window while attempting to clean the window. Like the present case, the plaintiff in *Snoznik*, due to his injuries, had little memory of the events leading up to the accident. (Id. p. 4). Plaintiff retained a design expert, Dr. Durig, who opined that the window was defective and unreasonably dangerous. (Id. p. 5). Defendant filed a Motion to Exclude Durig's testimony under Daubert, arguing, among other things, that Durig's opinions were not reliable.

The court granted defendant's motion to exclude Durig. Initially, the court noted that Durig's opinions were dependent on a specific factual scenario for the accident, involving a repeated but unknown number of manipulations of the hinges (Id. p. 10). Consequently, the court noted that plaintiff was using Durig's testimony to show how the accident actually occurred. (Id. p. 10). Given the limited recall of the plaintiff, the court found that there was no evidence in the record to suggest that the accident window had been subject to such repeated manipulation, and thus, no evidence to support Durig's accident scenario. The court then noted that there were a number of alternative accident scenarios, but no evidence to establish that Durig's proposed scenario more likely than not occurred. (Id. p. 11). Instead, there was only conjecture and speculation by Durig as to what might have happened. (Id. p. 11).

The present case is analogous. Because the design defect relied on by plaintiff is the contact trip, plaintiff must prove a specific accident scenario in which the nail gun's trigger

was already depressed at the time the contact trip came into contact with plaintiff's chest. Because of plaintiff's impaired memory, he has not, and cannot, provide an evidentiary basis for such a finding. Sadegh admits that there is insufficient physical evidence to support an accident reconstruction, and thus, he had to rely on one version of plaintiff's "memory" of how the accident occurred. Accordingly, Sadegh's opinions, like those of Durig in *Snoznik*, lack an adequate factual foundation, and must be excluded.

Moreover, the court in *Snoznik* also found that Durig failed to employ reliable scientific methodology to support his opinions. (Id. p. 12). Specifically, the court found that Durig's testing methodology consisted of having "played with" and manipulated an exemplar window. (Id. p. 11). Durig made no video recordings to document his testing. (Id. p. 11). The court noted that this failure to document testing made it extremely difficult for the court to determine reliability, and made it impossible to be reviewed or replicated by others in the scientific community. (Id. p. 12).

Here, Sadegh admits that he did no testing to support his opinions. (Sadegh Dep. 55, 131). Sadegh did not videotape either of his inspections of the accident site. (Dep. 46). There is no way for the court, or others in the scientific community, to replicate or verify what Sadegh did during his site inspections. Sadegh's methodology falls short of that which the court in *Snoznik* found was insufficient. Accordingly, Sadegh's testimony should likewise be excluded.

## CONCLUSION

For all of the foregoing reasons, it is respectfully submitted that defendant's Motion to Exclude the Testimony of Ali M. Sadegh should be granted.

**LEWIS, RICE & FINGERSH, L.C.**

By:/s/ David L. Coffman
David L. Coffman, #34200
600 Washington Avenue, Suite 2500
St. Louis, MO 63101
(314) 444-7600
(314) 241-6056 (facsimile)

and

Richard T. Mullineaux, #9874-22
Kightlinger & Gray, LLP
Bonterra Building, Suite 200
3620 Blackiston Boulevard
New Albany, IN 47150

Attorneys for Defendant
Stanley Fastening Systems, L.P.

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of May, 2011, a copy of the foregoing Motion for Summary Judgment was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system and/or U.S. Mail. Parties may access this filing through the Court's system.

John D. Boren
Boren, Oliver & Coffey
59 Jefferson Street
Martinsville, IN 46151
johnboren@boclawyers.com

Stephen A. Oliver
Boren, Oliver & Coffey
59 N. Jefferson Street
Martinsville, IN 46151
steveoliver@boclawyers.com

J. Scott Callahan
1310 16th Street
Bedford, IN 47421
scott@scottcallahanattorney.com

/s/ David L. Coffman