UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| GLENN DALE RUNGE and | ) | |
| BETTY ANN RUNGE (Guardians | ) | |
| of Glenn Andrew Runge) | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:09-cv-00130-TWP-WGH |
| | ) | |
| STANLEY FASTENING SYSTEMS, L.P., | ) | |
| a division of STANLEY BOSTICH, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY ON MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendant Stanley Fastening Systems, L.P.'s ("Stanley") Motion for Summary Judgment.[1] Stanley manufactures an array of fastening tools. This case arises out of a tragic accident involving the N80SB-1 pneumatic nail gun. On August 30, 2007, Glenn Andrew Runge ("Andrew") was working with his father's nail gun when he accidentally tripped and fell down onto the gun, resulting in the inadvertent discharge of a nail into his chest, which pierced his heart. As a result of the accident, Andrew suffered brain injuries that left him functionally blind and cognitively impaired. Glenn Dale Runge ("Glenn") and Betty Ann Runge (collectively, "Plaintiffs"), Andrew's parents and co-guardians, sued Stanley under the Indiana Products Liability Act, alleging that the nail gun at issue was defectively manufactured, defectively designed, and carried inadequate warnings. In their summary judgment response brief, Plaintiffs concede that they do not have a viable manufacturing defect claim. Therefore, Stanley's summary judgment motion only applies to the

---

[1] As discussed throughout this entry, other motions are intertwined with Stanley's Motion for Summary Judgment. The Court will address those motions as needed.

remaining claims of defective design and inadequate warning.[2]  For the reasons set forth below,

Stanley's Motion for Summary Judgment (Dkt. 54) is **GRANTED** in part and **DENIED** in part.

## I.  PRELIMINARY EVIDENTIARY ISSUES

As a threshold matter, the Court acknowledges that it must address two evidentiary

motions before determining the undisputed facts for purposes of summary judgment.  Each

motion is addressed in turn.

### A.    Motion to Permit use of Deposition Testimony Taken in Previous Actions

First, Plaintiffs seek to use depositions that were taken in previous products liability

lawsuits involving Stanley nail guns (Dkt. 66).  Specifically, to bolster their allegations of

defectiveness and unreasonable danger, Plaintiffs rely heavily on the deposition testimony of two

former Stanley employees: Ed Colechia ("Colechia") and Robert Olmstead ("Olmstead").

Colechia's testimony was given on February 13, 1992 for the case of *Drabik v. Stanley Bostitch,*

*Inc.*, 796 F. Supp. 1271 (W.D. Mo. 1971), *reversed* 997 F.2d 496 (8th Cir. 1993).  At the time of

his deposition, Colechia was one of Stanley's senior product managers.  Stanley has represented

that, unfortunately, Colechia is now deceased.  Olmstead's deposition testimony comes from his

30(b)(6) deposition taken on May 16, 2005 in *Kanowske v. Stanley Fastening Systems, L.P.*, a

Wisconsin case filed in 2003.  Olmstead was Stanley's chief engineer at the time the nail gun at

issue in the *Kanowske* case was manufactured.   Stanley opposes the Plaintiffs' motion to permit

the use of Colechia and Olmstead's depositions. (Dkt. 105).

The decision whether to permit the use of depositions is governed by a three-part analysis

found in Fed. R. Civ. P. 32.  Specifically, Rule 32(a)(1) provides that:

---

[2] Oral arguments on pending motions were held on September 14, 2011.  The Court thanks counsel for their exceptional advocacy.

> At a hearing or trial, all or part of a deposition may be used against a party on these conditions: (A) the party was present or represented at the taking of the deposition or had reasonable notice of it; (B) it is used to the extent it would be admissible under the Federal Rules of Evidence if the deponent were present and testifying; and (C) the use is allowed by Rule 32(a)(2) through (8).

Notably, the use of a deposition under Rule 32 does not implicate hearsay concerns. *See Ueland v. U.S.*, 291 F.3d 993, 996 (7th Cir. 2002) ("Rule 32(a), as a freestanding exception to the hearsay rule, is one of the 'other rules' to which Fed. R. Evid. 802 refers. Evidence authorized by Rule 32(a) cannot be excluded as hearsay, unless it would be inadmissible even if delivered in court.")

Here, Rule 32(a)(1)(A) is satisfied, as Stanley was present and represented at the taking of the depositions of both Colechia and Olmstead. Similarly, Rule 32(a)(1)(B) is satisfied, at least for purposes of the present summary judgment motion. On this point, it is worth noting that all of Stanley's objections will be preserved for trial. *See Pesterfield v. Sunbeam Corp.*, 2005 WL 1076293, at *2-3 (E.D. Tenn. May 6, 2005) (allowing deposition testimony in previous products liability matters involving electric beds; "[b]y ruling that Plaintiff may use prior deposition and trial testimony obtained in collateral cases, the Court makes no ruling upon the admissibility of such testimony at trial").

Having met the first two criteria, Plaintiffs now must show that the depositions at issue fall within one of the categories contemplated by Rule 32(a)(2) through (8). According to Plaintiffs, this is a straightforward analysis. First, Olmstead was Stanley's 30(b)(6) designee in the *Kanowske* litigation, and Rule 32(a)(3) provides that "an adverse party may use for any purpose the deposition of a party or anyone who, when deposed, was the party's officer director, managing agent, or designee under Rule 30(b)(6)[.]" Second, Colechia has passed away and Rule 32(a)(4)(A) provides that "[a] party may use for any purpose the deposition of a witness,

whether or not a party, if the court finds … that the witness is dead." The Court, however, is somewhat skeptical of these arguments, as these provisions appear to apply only to depositions taken in *current* lawsuits – not *previous* lawsuits. This is evidenced by Rule 32(a)(8), which specifically contemplates the use of "Depositions Taken in an <u>Earlier</u> Action," providing that:

> A deposition lawfully taken and, if required, filed in any federal- or state-court action may be used in a later action involving the <u>same subject matter between the same parties</u>, or their representatives or successors in interest, to the same extent as if taken in the later action. A deposition previously taken may also be used as allowed by the Federal Rules of Evidence.

Fed. R. Civ. P 32(a)(8) (emphasis added). Thus, the Court must address whether Plaintiffs are permitted to use the depositions under Rule 32(a)(8).

Stanley's main counter-argument to allowing use of the depositions under Rule 32(a)(8) is that the prior actions involved different nail gun models, different time periods, different injuries, and, thus, different subject matter. The Court is not persuaded. The thrust of the deposition excerpts cited by Plaintiff relate broadly to the general product history of the Stanley nail guns and the use of sequential trips versus contact trips. For these particular issues, any difference in nail gun model or type of injury is inconsequential. Both factually and legally, the prior cases are sufficiently similar to the present case to permit use of the deposition excerpts. Somewhat ironically, Stanley has urged the Court to take heed of the factual backdrop of *Drabik*, 997 F.2d 496. Then, in that same breath, Stanley urges the Court to disregard Colechia's deposition, which was taken in *Drabik*. Stanley cannot have it both ways.

Surprisingly, Stanley gives short shrift to the fact that the prior depositions did not involve the "same parties," even though this appears to be an explicit requirement of Rule 32(a)(8). But even if this was the focal point of Stanley's argument, however, it would not carry the day. The general rule is that "depositions taken in a prior action are admissible in a

subsequent action if there is substantial identity of issues and parties in the two actions." 10A Fed. Proc., L. Ed. § 26:521.  Significantly, "total identity of parties … is not required," *id.*, and the "same party" rule has "been construed liberally in light of the twin goals of fairness and efficiency." *Phillip M. Adams & Associates, LLC v. Winbond Electronics Corp.*, 2010 WL 3655869, at *1 (D. Utah Sept. 14, 2010) (quoting *Hub v. Sun Valley Co.*, 682 F.2d 776, 778 (9th Cir. 1982)).  Thus, courts interpreting this rule "recognize that the real test should be whether the former testimony was given upon such an issue that the party-opponent in that case had the same interest and motive in his cross-examination that the present opponent now has." *Id.* (citing Wright, Miller & Marcus, Federal Practice and Procedure § 2150).  As such, "<u>many cases have held that a deposition can be offered against one who was a party to the former suit even though the party now using the deposition was not</u>." Wright, Miller & Marcus, Federal Practice and Procedure § 2150 (emphasis added; collecting cases, including *Ikerd v. Lapworth*, 435 F.2d 197 (7th Cir. 1970)).  Under this reasoning, the Court **GRANTS** Plaintiffs' motion (Dkt. 66).

In granting this motion, however, the Court would be remiss not to take issue with the timing of Plaintiffs' argument.  As discussed, Plaintiffs rely heavily on Colechia and Olmstead's depositions in urging the Court to deny summary judgment.  The importance of this evidence to their case notwithstanding, Plaintiffs waited until *the day of their summary judgment response* to spring this motion on Stanley.  It is unclear why this was done in such a belated fashion; suffice it to say, this issue put both Stanley and the Court in a difficult position, and should have been aired out well before the eleventh hour.  Prior to trial, Plaintiffs will be required to designate the specific portions of each deposition that they intend to offer, so that Stanley will have ample time to lodge objections.

**B.     Motion to supplement the summary judgment record**

Almost two months after the present summary judgment motion became ripe, Stanley filed a Motion to Supplement the Summary Judgment Record (Dkt. 118), which Plaintiffs opposed (Dkt. 119). Specifically, Stanley seeks to add deposition excerpts from David Wiesehan and Mark Wiesehan, neighbors of Plaintiffs, who testified as to their recollection of the scene of the accident and Andrew's carpentry skills. The Court will **GRANT** Stanley's motion (Dkt. 118). That said, the Court finds that this additional evidence is not a game-changer for purposes of summary judgment.

## II. <u>BACKGROUND</u>

Having resolved the preliminary evidentiary issues, the Court now turns to the relevant facts.

**A.     The nail gun's firing mechanism**

The crux of Plaintiffs' claims is that the nail gun at issue has a contact trip firing mechanism as opposed to a sequential trip firing mechanism. To fire a contact trip gun, the user must do two things in no particular order: (1) hold the trigger down and (2) bump the nose of the nail gun onto the target. A nail is discharged at each bump, assuming the trigger remains engaged. In other words, the user can hold down the trigger and bump the gun against multiple targets to discharge multiple nails, thereby boosting speed and productivity. In contrast, a sequential trip requires a sequential process in order to fire. First, the user must press the nose of the nail gun against the target; second, the user must press the trigger in order to discharge a nail. Stated differently, if the trigger is pressed *before* the nose of the gun is pressed against a target, the gun will not fire. In effect, this means that the user must press the trigger each time he fires

the nail gun.  This type of firing mechanism reduces the risk of an inadvertent discharge, but it also slows down the nailing process, potentially hampering productivity.

Plaintiffs argue that the use of a contact trip in lieu of the sequential trip renders the nail gun defective and unreasonably dangerous.  Plaintiffs also argue that the accident never would have occurred if Andrew had been using a sequential trip nail gun because the trigger was depressed before the nose of the gun made contact with Andrew's chest.

**B.      Product history**

It is seemingly undisputed that contact trip nail guns are less safe than sequential trip nail guns.  According to one of Plaintiffs' experts, contact trip nail guns are twice as risky as sequential trip nail guns in the realm of residential construction.  In terms of safety, part of the problem with the contact trip arises from the way nail guns are typically carried.  Specifically, the area near the trigger is the gun's "center of gravity"; consequently, users have a tendency to carry the nail gun with their fingers near the trigger or with the trigger depressed.  If a contact trip nail gun is carried this way, then there is heightened risk of an accident.  If the trigger is already depressed, then inadvertently bumping the nose of the gun into an object causes a nail to discharge into that object.

According to the testimony of Colechia, Stanley initially responded to the inadvertent discharge problem by making the handle of the nail gun longer, which provided the user with more space to rest his hand without placing his fingers on the trigger.  This modification was designed to reduce accidents as much as possible, but it wasn't a cure-all. At some point, Stanley began developing the sequential trip nail gun. Colechia testified that the "initial development" of the sequential trip was not to "prevent inadvertent firing"; instead, Stanley was in search of a

design that would place nails more accurately. Colechia testified that "[o]ur result was the sequential trip which resulted in the bonus of a safer trip."

The use of a sequential trip reduced, if not eliminated, the risk of inadvertent discharge. But this safety-improvement was not without expense. Colechia testified that the sequential trip roughly doubled the manufacturing cost of the gun. When asked to specify the increase in terms of dollars and cents, Colechia estimated that it increased the manufacturing cost by about one dollar per nail gun.[3] However, according to Colechia, Stanley did not incorporate this uptick in the manufacturing cost into the sale price of sequential trip guns. On March 28, 1972, Stanley made the sequential trip nail gun its standard product. Colechia recommended this change because he felt that the sequential trip was a "better product for … place firing" and "it was also a safer product." Colechia testified that the sequential trip was safer because "[y]ou have better control," "[i]t is one more sequence that has to be followed," and therefore, "it slows the work … so that [the worker] can't produce as fast."

Obviously, speed can cause accidents and, in Colechia's words, a sequential trip "is probably one-third slower in operating because you have an extra function each time you fire a nail." But, as a practical matter, workers often don't like to work slowly; moreover, employers generally don't like impediments to productivity. Accordingly, some customers began modifying their sequential trip guns into contact trip guns "on their own," and, in many cases, "they were improperly doing this." For this reason, months after the decision to make the sequential trip nail gun its standard product, Stanley began including a conversion kit with the sequential trip gun that allowed users to transform it into a contact trip. Further, Colechia

---

[3] The operative time period relating to this particular testimony is not crystal clear, but Colechia appears to be referring to roughly 1972. Assuming that is correct, it is interesting to note that, due to inflation, $1 in 1972 is the equivalent of roughly $5.42 today. *See* US INFLATION CALCULATOR, www.usinflationcalculator.com (last visited December 8, 2011).

conceded that Stanley did not want to be held responsible for any damages or injuries resulting from a customer who modifies a sequential trip into a contact trip.

Subsequently, on April 3, 1973, presumably due to sagging customer demand for the sequential trip gun, Stanley switched gears and again began offering contact trips as its standard product. Tellingly, prior to the changeover, Stanley was selling more conversion kits (to change sequential trips to contact trips) than actual sequential trip tools. As Colechia noted, "[w]hen you sell more kits, it means they're converting them all back." Colechia surmised that, based on their purchasing decisions, customers were doing a cost-benefit analysis and concluding that "[t]he utility of the contact trip far outweighed the advantages … that we could give them with the sequential trip." That said, Colechia disagreed with the decision to change back to contact trip guns, testifying that "I felt that we had a distinct marketing advantage … in having a sequential trip" because Stanley was the only manufacturer in the nail gun market offering the sequential trip. Nonetheless, Colechia also conceded the reality that "if you can't sell it, you can't stay in business very long."

In November 1996, Stanley began including a conversion kit with its contact trip guns, allowing the user to modify the gun into a sequential trip. However, the gun purchased by Glenn was manufactured on August 16, 1996, so it did not include a conversion kit. According to Olmstead, the inclusion of the conversion kit was not done for safety reasons. Rather, it was done because home centers became a bigger outlet for nail guns and the stores would not provide shelf space for both sequential and contact trip guns.

## C.     The gun and the accident

In 1998, Glenn purchased the contact trip nail gun at issue at a lumber company. In fact, that particular gun was the only one sold at the lumber company. Glenn further testified that he

did not know that it was possible to modify the firing mechanism of a nail gun. Also, at the time he bought the gun, Glenn was not familiar with the difference between contact trip and sequential trip firing mechanisms. Over time, however, Glenn and Andrew both gained experience using sequential trip nail guns. Glenn has purchased two sequential trip nail guns, buying the first one in 2000. As a result of buying the two different types of nail guns, Glenn understood the difference between their firing mechanisms. Glenn also testified that Andrew had used both types of nail guns and appreciated the difference between their firing mechanisms.

Andrew's nail gun-related safety training consisted of learning from Glenn and reading the owner's manual. Glenn testified that Andrew knew more about the manual than he did. Moreover, Glenn testified that he told Andrew to always carry the gun with his finger off the trigger. Glenn testified that Andrew typically carried the gun with his forefinger resting on the flat spot above the trigger, in case the nose of the gun bumped against something. At his own deposition, Andrew testified that he had used the nail gun "quite a few years," that he understood that there were many ways a nail gun user could be injured, and he recognized that the nail gun cannot distinguish "wood" from "flesh and bone."

Notably, in order to use the nail gun, the user must connect it to the air hose. Disconnecting the gun from the air hose effectively deactivates the gun, meaning the gun can no longer fire nails. Indeed, the operator's manual instructs users to "[a]lways disconnect air supply … when moving to a different work area, as accidental actuation may occur, possibly causing injury." Glenn testified that he and Andrew sometimes disconnected the gun while moving around work sites, presumably depending on the distance between sites. For instance, Glenn testified that if he was moving from a first floor to a second floor, "that would probably be a

disconnection."  Finally, Glenn testified that, based on his overall observations, Andrew knew how to use nail guns safely.

At the time of the accident, Andrew was working by himself in a barn and was using the gun to nail together blocks of wood to support his combine machine while he worked on it. Because Andrew was the only potential witness to the accident, his deposition testimony is the only available account.  The relevant portions of his deposition follow:

> Q: All right. Do, do you remember anything about how it happened? Were you carrying the nailer?
> A: Yes.
> …
>
> Q: Were you working on your combine?
> A: Yes.
> Q: Were you going to nail together some blocks?
> A: Yes.
> Q: To block up the combine axle?
> A: Yes.
> Q: Okay. And were, were you carrying the nailer from one side of the barn to the other?
> A: Yes.
> Q: Okay. What – was it already hooked up to the air hose?
> A: Yes.
> Q: Okay. And did, did you fall?
> A: Oh, yes.
> Q: Okay. Did you fall before or after you got shot?
> A: After.
> Q: Okay. Did you fall on top of the nailer?
> A: Yes, yes, yes, I did.
> Q: Okay. Andrew, do you remember – I don't know how well you'll be able to see me.  Can, can you see how I'm holding the nailer? Can you see how I'm carrying it?
> A: Sort of.
> Q: All right. Can, can you tell me how you were carrying it? In other words, were you carrying it the normal way like you were going to use it, by the handle?
> A: Yes.
> Q: Okay.
> …
>
> Q: All right. Do you remember what caused you to fall?
> A: The air hose.

Q: Did, did you trip over the air hose?
A: Yes.
Q: Okay. Did the air hose get caught on something?
A: Yes.
Q: All right. Did, did you do anything to try and get the hose unstuck? In other words, did you, did you yank or jerk on the nailer to try and free the hose?
A: Yes.
Q: But it was stuck?
A: It was stuck, yeah.
…

Q: Okay. Let me see if I understand what you're telling me. You were carrying it over to the combine and the hose got stuck; is that right?
A: That's right.
Q: Okay. So in other words, it wouldn't reach all the way to the combine?
A: No, that's not right. It would, it would reach over to the combine.
Q: Okay. If it was unstuck?
A: Yeah.
Q: Okay. So you yanked on it a few times to try and get it loose. Did I understand you correctly?
A: Not really.
Q: Okay. What did you do to try and get it loose?
A: I couldn't get it loose.
Q: Okay. How – what – did you try to get it loose?
A: Uh-uh.
Q: I'm sorry?
…

A: I never – I didn't get it loose at all. I just, I just let it be there, because I couldn't, I couldn't get it loose at all.
Q: Okay. All right.
A: I just left it there and whatever happened happened.
Q: Okay. All right. And when you fell, you landed on top of the nailer; is that correct?
A: That's correct.
Q: Okay. And you still had it in your hand?
A: Oh, yes.
Q: Okay. And that's when it fired?
A: Yeah, that's when it fired.
Q: Okay. Did you have your finger on the trigger?
A: Yes, I had a finger on the trigger.
Q: Was it your finger or your thumb?
A: It was my thumb.
Q: Thumb. Okay. And do you know how your thumb got to be on the trigger?
A: I don't know.

Q: Okay. Do you know if your thumb was on the trigger when you were carrying the nailer over to the combine?
A: Yes, it was was.

. . .

Q: What I'm asking, Andy, were you pulling on the nailer like this with your thumb on the trigger?
A: Yes.

. . .

Q: Okay. And so is that how you were holding the gun?
A: Yes.
Q: All right. Now, about how many steps did you take with the gun in your hand before you stumbled?
A: About ten steps.
Q: About ten steps?
A: Yeah.
Q: Okay. Now, can you hold the gun up like this?
A: (Witness complies)
Q: All right. Now, were you holding it with any other – did you use your other hand to hold it at all?
A: Yes.
Q: Okay. Can you, if I take your – can you show us how you were holding it?
A: Like that (indicating).
Q: All right. Now, did the hose get caught?
A: Yes.
Q: All right. And when the hose got caught, did the gun twist in your hand?
A: Yes.
Q: And when the gun twisted in your hand, what did your thumb do?
A: Went on the trigger.
Q: Went on the trigger?
A: Yeah.
Q: And did you begin to fall at that time?

. . .

Q: Okay. Did you begin to fall at the time?
A: Yes, sure did.
Q: Okay. And as you fell, can you show us where the nozzle went?
A: Right here (indicating).
Q: Okay. And did it, and did – as you fell, did the nozzle come into contact with your body?
A: Oh, yes.
Q: Okay. And do you know, did your thumb come into contact with the trigger at that time?
A: Oh, yes.
Q: It did?

13

A: Yeah.
Q: All right. And you fell to the ground?
A: That's right.
Q: Did the gun hit the ground?
A: Yeah.
Q: Okay.
A: Sure did.
Q: Okay. And then did you have a nail go into your chest?
A: Yeah, sure did.

Immediately after the accident, Andrew attempted to pry the nail out of his chest using a knife. Andrew then walked outside, where he received help from his neighbor. When an ambulance arrived, Andrew was still conscious, but, at some point, he lost consciousness and slipped into a coma. At his deposition, Glenn testified that, upon coming out of the coma, Andrew stated that "I just tripped, the hose got caught, I tripped. The gun must have come in contact with my body. It went off and I shot myself in the heart accidentally."

As a result of the accident, Andrew suffered an anoxic-ischemic brain injury leaving him functionally blind and impaired both cognitively and physically. Among other problems, Andrew has an impaired memory, impaired concentration, an unsteady gate, and slowed motor skills. And as a result of his vision deficits, Andrew cannot read a newspaper or watch television. Additional facts are added below as needed.

## III.  LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences

in that party=s favor.@ *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).

However, A[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial.@ *Hemsworth*, 476 F.3d at 490 (citation omitted). AIn much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim.@ *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted). A[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment.@ *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

## IV.   ANALYSIS

Plaintiffs' two remaining claims, defective design and failure to warn, arise under the Indiana Products Liability Act ("IPLA").  The IPLA governs all actions that are: "(1) brought by a user or consumer; (2) against a manufacturer or seller; and (3) for physical harm caused by a product … regardless of the substantive legal theory or theories upon which the action is brought." Ind. Code § 34-20-1-1.  Under the IPLA, a plaintiff must prove that: (1) "the product was defective and unreasonably dangerous"; (2) "the defective condition existed at the time the product left the defendant's control"; and (3) "the defective condition was the proximate cause of the plaintiff's injuries." *Deaton v. Robison*, 878 N.E.2d 499, 501 (Ind. Ct. App. 2007) (citation omitted).  The Court begins its analysis with Plaintiffs' defective design claims.

**A.     Design defect**

Design defect claims are essentially subject to a garden-variety negligence standard. *See* Ind. Code § 34-20-2-2 ("in an action based on an alleged design defect in the product … the party making the claim must establish that the manufacturer or seller <u>failed to exercise reasonable care under the circumstances</u> in designing the product …") (emphasis added).  Here, Plaintiffs allege two distinct defective designs: (1) the nail gun used a contact trip instead of a sequential trip; and (2) the nail gun didn't include a trigger guard or a safety lockout.  Each is addressed in turn.

**1.     Contact trip versus sequential trip**

First, Plaintiffs contend that the nail gun was defectively designed because it used a contact trip instead of a sequential trip, which, in Plaintiffs' view, is a feasible and safer alternative design.  Stanley counters that Plaintiffs cannot establish that the contact trip nail gun was unreasonably dangerous or defectively designed.  And even if Plaintiffs could show defective design, Stanley argues, they cannot show that the defective design was the proximate cause of Andrew's injuries.

**i.     Is Stanley entitled to a rebuttable presumption of non-defectiveness?**

Under Indiana law, "<u>there is a rebuttable presumption that the product that caused the physical harm was not defective and that the manufacturer or seller of the product was not negligent</u> if, before the sale by the manufacturer," the product: (1) "was in conformity with the generally recognized state of the art applicable to the safety of the product at the time the product was designed, manufactured, packaged, and labeled"; or (2) "<u>complied with applicable codes, standards, regulations, or specifications established, adopted, promulgated, or approved by the</u>

United States or by Indiana, or by an agency of the United States or Indiana." Ind. Code § 34-20-5-1 (emphasis added).  The parties dispute whether Stanley is entitled to this presumption.

The Court finds that the presumption applies.  The available evidence establishes that the gun complied with all applicable codes, standards, regulations, or specifications.  Specifically, OSHA regulation 29 C.F.R. § 1926.302(b)(3) requires that:  "[a]ll pneumatically driven nailers … shall have a safety device on the muzzle to prevent the tool from ejecting fasteners, unless the muzzle is in contact with the work surface." In other words, OSHA regulations only mandate that nail guns cannot function like other guns that shoot projectiles through the air with the mere pull of a trigger; instead, the nose of the nail gun must be in contact with the target before nails can be discharged.  Undoubtedly, Stanley's contact trip nail gun complies with this regulation. *See Slisze v. Stanley-Bostitch*, 979 P.2d 317, 321 (Utah 1999) (holding that court properly admitted OSHA regulation 29 C.F.R. § 1926.302(b) to establish rebuttable presumption of non-defectiveness in case involving Stanley nail gun).

Plaintiffs counter that this regulation is inapplicable because it does not address the type of hazard at issue (i.e. the inadvertent firing of a nail caused by the user of the gun bumping into an object).  However, this does not change the overarching fact that Stanley complied with all applicable regulations.  According to the statute, *compliance* is all that is necessary for a party to receive the rebuttable presumption.  Plaintiffs have not given the Court any authority suggesting that a regulation's silence on a potential hazard can eviscerate the rebuttable presumption.

Moreover, one of Plaintiffs' experts, Mark Ezra ("Ezra"), testified that during the time the nail gun at issue was manufactured, the majority of nail guns sold were contact trip, and there was no federal, state, local rule or regulation, and no industry standard that prohibited the manufacture and sale of a contact trip nail gun.  Another one of Plaintiffs' experts, Ali Sadegh

("Sadegh"), testified that he was not aware of any sort of regulation with which the contact nail gun failed to comply. For all of these reasons, the Court finds that the rebuttable presumption applies.

### ii. Does Plaintiffs' evidence rebut this presumption?

Having determined that the statutory presumption applies, the Court now must determine whether Plaintiffs can rebut it. Before addressing that issue, however, it is worth noting that it is altogether unclear what appreciable impact the rebuttable presumption has at the summary judgment stage. Needless to say, rebuttable presumptions are not impenetrable barriers to trial. *See, e.g., Marr v. Bank of America, N.A.*, -- F.3d --, 2011 WL 6091806 (7th Cir. Dec. 6, 2011). With respect to this particular rebuttable presumption, the Indiana Court of Appeals recently stated, "[t]his presumption may be rebutted, at least for purposes of summary judgment, if the designated evidence demonstrates a question of fact remains as to whether the product was defective." *Miller v. Bernard*, -- N.E.2d --, 2011 WL 5931997, at *9 (Ind. Ct. App. Nov. 29, 2011) (ruling that presumption was rebutted for purposes of summary judgment). This sounds strikingly similar to the normal summary judgment standard. In other words, even if the rebuttable presumption applies, Plaintiffs will live to fight another day if genuine issues of material fact remain after application of the presumption.

Plaintiffs argue that even if the presumption applies, then they can rebut it because "a reasonable jury could find Stanley negligent for failing to equip the gun with a mechanism that would eliminate or reduce the hazard by use of the sequential trip." To determine whether the presumption against defectiveness and negligence has been rebutted, the Court first seeks guidance from the IPLA's definition of "defective," which provides that:

> A product is in a defective condition under this article if, at the time it is conveyed by the seller to another party, it is in a condition: (1) not contemplated by

reasonable persons among those considered expected users or consumers of the product; and (2) <u>that will be unreasonably dangerous to the expected user or consumer when used in reasonably expectable ways</u> of handling or consumption.

Ind. Code 34-20-4-1 (emphasis added). Further, under the IPLA, the term "unreasonably dangerous," refers to any situation "in which the use of a product exposes the user or consumer to a risk of physical harm <u>to an extent beyond that contemplated by the ordinary consumer who purchases the product with the ordinary knowledge about the product's characteristics</u> common to the community of consumers." Ind. Code § 34-6-2-146 (emphasis added). As the Indiana Court of Appeals has clarified, "a product can be 'dangerous,' as that term is commonly understood, without being 'unreasonably dangerous' for purposes of liability under the Act." *Meyers v. Furrow Bldg. Materials*, 659 N.E.2d 1147, 1149 (Ind. Ct. App. 1996); *Welch v. Scripto-Tokai Corp.*, 651 N.E.2d 810, 814 (Ind. Ct. App. 1995) ("although a loaded gun is certainly dangerous in the literal sense … it may not be 'unreasonably dangerous' for product liability purposes as long as it functions properly.").

Because the term "unreasonably dangerous" is part of the definition of "defective," it is clear that the two concepts are interrelated. That being said, courts have emphasized that a plaintiff must show *both* defectiveness *and* unreasonable danger in order to prevail on a defective design claim. *See McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651, 657 (7th Cir. 1998) (applying Indiana law; "[t]o prevail the plaintiff must show not only that the design is defective <u>but also that the defective product is 'unreasonably dangerous'</u>") (emphasis added; citing *Koske v. Townsend Engineering Co.*, 551 N.E.2d 437, 440 (Ind. 1990)). In reality, however, this seems like an artificial distinction in light of the definition of "defect." Presumably, a showing of a "defect" necessarily includes a showing of unreasonable danger.

Stanley argues that the nail gun was not unreasonably dangerous because it performed as intended and Andrew fully understood the risks associated with the contact trip gun. To bolster this claim, Stanley relies almost exclusively on the Indiana Court of Appeals decision in *Deaton*, 878 N.E.2d 499, cited above, for the proposition that if the user of a product fully appreciates its risks, then that product cannot be considered unreasonably dangerous as a matter of law. In the *Deaton* case, Deaton (the plaintiff) and Robison (one of the defendants) were in Robison's garage preparing to go deer hunting. *Id*. at 500. Robison realized that he needed to unload his MK-95 rifle from the previous day's hunt, remarking "I've got to unload this before I kill somebody." *Id*. While Robison was trying to do so, however, he inadvertently caused the rifle to fire, shooting Deaton in the leg. *Id*. The rifle had two safeties but, at the time of the shooting, only one was engaged. *Id*. Moreover, the rifle would not have fired had both been engaged. *Id*. Deaton sued Robison for negligence and Knight Rifles, Inc., the gun manufacturer, for carrying inadequate warnings. *Id*. at 501.

During trial, Knight Rifles moved for judgment on the evidence, which the trial court granted. *Id*. Deaton appealed. *Id*. at 500. Affirming the trial court's ruling, the Indiana Court of Appeals highlighted that:

> the evidence shows that Robison fully appreciated the danger of unloading the gun in the presence of others and that he knew engaging the secondary safety would have prevented the shooting. It is undisputed that Robison appreciated the danger inherent in handling a loaded rifle and in unloading a rifle while pointing it at someone.

*Id*. at 503. This was evidenced by Robison's own words right before the accident. *Id*. In sum, because the defendant fully appreciated the risks of his conduct, unreasonable danger could not be established as a matter of law. *Id*. at 503-04; *see also Moss v. Crosman Corp.*, 136 F.3d 1169, 1175 (7th Cir. 1998) (affirming summary judgment on unreasonable danger grounds in case

where a child died as a result of being shot with a BB gun; "the average person in the community knew the general kind of physical risk posed by a BB gun").

This argument is well-taken. To be candid, *Deaton* gives this Court some pause, as the available evidence shows that: Andrew was an experienced nail gun user; he had read the owner's manual; he had used both contact trip and sequential trip nail guns; he understood the differences in the firing mechanisms of the guns; and he acknowledged that a nail gun cannot distinguish wood from flesh and bone. Thus, the notion that Andrew did not appreciate the general risks inherent in walking around and using an activated nail gun is difficult to square with the available evidence. Moreover, common sense dictates that nail guns are, in common parlance, *dangerous*, and "Indiana does not condemn products as defective just because they are designed to do things that create serious hazards." *McMahon*, 150 F.3d at 658.[4]

However, despite any similarities between *Deaton* and the present circumstances, the Court still finds that genuine issues of material fact remain with respect to defectiveness and unreasonable danger. It is true, as Stanley emphasizes, that Andrew may have appreciated the general risks associated with nail guns and understood the difference between the firing mechanisms of the contact trip versus the sequential trip. In this way, Andrew is similar to the

---

[4] Stanley did not argue that the alleged defect at issue was "open and obvious." Although "open and obvious" arguments are no longer an absolute bar to liability under the IPLA, they can still be relevant to "unreasonable danger" determinations. *Welch*, 651 N.E.2d at 815 ("the relative obviousness of a defect is nevertheless relevant in determining whether or not a product is defective and unreasonably dangerous."). The rationale underlying this principle is that if a defective condition is "open and obvious," then it inescapably follows that a normal user would appreciate the product's accompanying risks. The absence of this argument is perhaps somewhat surprising, given that Indiana courts have applied an "open and obvious" analysis in a variety of contexts. *See, e.g., Bourne v. Marty Gilman, Inc.* 2005 WL 1703201, at *5 (S.D. Ind. July 20, 2005) (granting summary judgment and finding that goal post was not unreasonably dangerous; "the risk that a person might be hurt by a 40-feet tall metal structure falling under the weight of a dozen or more people was obvious … to any reasonable observer on the scene"); *Anderson v. P.A. Radocy & Sons, Inc.*, 67 F.3d 619, 624-26 (7th Cir. 1995) (affirming summary judgment based on obvious risk that a metal crane would conduct electricity from overhead wires to injure or kill the operator); *Welch*, 651 N.E.2d at 814 (affirming summary judgment; "the ordinary adult consumer contemplates the risks posed by a lighter, including the dangers associated with children who play with lighters"). However, because Stanley didn't make this argument, the Court is not inclined to consider it. And, in any event, even if this argument was fleshed out, it is unlikely that it would have prevailed.

defendant in *Deaton*. The present circumstances are distinguishable because the evidence shows that Andrew may not have had a true appreciation for the *nature and extent* of the risks posed by the contact trip as opposed to the sequential trip; thus, he may not have had any appreciation for the *likelihood* that he would suffer an injury. This position is bolstered by the unique product history, described above, which shows that Stanley was cognizant that the contact trip is more dangerous than the sequential trip. And perhaps more importantly, Plaintiffs' expert, Mark Ezra, explicitly opined that the nail gun "was defective and unreasonably dangerous at the time of its design and manufacture for its reasonably anticipated and forseeable use due to the incorporation of a contact trip trigger mechanism and because such a trigger mechanism is prone to unintended discharge." Finally, this position is reinforced by the fact that the nail gun at issue did not include a conversion kit, and there is no evidence that Andrew or Glenn knew that the firing mechanisms of nail guns could be converted. Viewed cumulatively, the Court finds that this evidence is sufficient to create genuine issues of material fact with respect to defectiveness and unreasonable danger. *See Edwards v. ATRO SpA*, 891 F. Supp. 1074, 1079-81 (E.D.N.C. 1995) (implicitly ruling that genuine issue of material fact existed as to whether gun's contact trip mechanism was unreasonably dangerous under North Carolina law, and as to whether alternative design, i.e., sequential trip mechanism, should have been used).

The Court is compelled to discuss two final points. The first relates to the existence of safer alternative products in a given market. Throughout their briefing, Plaintiffs suggest that summary judgment should be denied solely because a contact trip is more dangerous than a sequential trip. Again, it is true that some accidents involving contact trip nail guns could be avoided by the use of the sequential trip. But the existence of a product with superior safety features does not render all parallel products unreasonably dangerous. Indiana law is well-settled

that "a manufacturer is not obliged to build the safest possible product, at least where the danger in question is known to a reasonable consumer." *Bourne v. Marty Gilman, Inc.* 2005 WL 1703201, at *7 (S.D. Ind. July 20, 2005), *affirmed* 452 F.3d 632 (7th Cir. 2006); *Anderson*, 67 F.3d at 625 n.5 ("The fact that a product could have been designed safer does not establish liability."). Otherwise, as the Seventh Circuit has colorfully noted, "the bare fact of a Volvo would render every KIA defective." *Bourne*, 452 F.3d at 638. Nonetheless, this principle does not give manufacturers blanket immunity to produce unreasonably dangerous products; to the contrary, this principle only applies where a product "is not dangerous to an extent beyond that contemplated by the ordinary consumer." *See Welch*, 651 N.E.2d at 815 n. 5. As discussed, this Court has determined that genuine issues of material fact exist regarding defectiveness and unreasonable danger.

The second issue relates to the marketability of the sequential trip. Stanley has produced evidence that the sequential trip was rejected by some in the marketplace. For example, some users began unilaterally modifying sequential trip nails guns into contact trip guns, and when Stanley began selling conversion kits, it sold more kits than actual sequential trip tools. As Colechia testified, the purchasing decisions of consumers demonstrated that consumers derive considerable utility from the contact trip: "The utility of the contact trip far outweighed the advantages … that we could give them with the sequential trip." To some degree, this evidence creates a conceptual hurdle: why should Stanley manufacture a product that some consumers have previously rejected as inferior? As the Seventh Circuit has noted, "Indiana neither requires manufacturers to be insurers nor to guard against all risks by altering the qualities sought by intended users." *Bourne*, 452 F.3d at 638.

But, regardless, this argument still runs smack-dab into the same response: there are still genuine issues of material fact regarding defectiveness and unreasonable danger. This position is reinforced by the fact that the nail gun at issue was not equipped with a conversion kit, and no evidence shows that either Glenn or Andrew even knew that the firing mechanism of nail guns could be modified. Finally, Plaintiffs have produced evidence suggesting that the productivity benefits conferred by the contact trip are overstated. Specifically, in his expert report, Mark Ezra opined that "[t]he cost savings realizable in bump-fire nailing [which is only possible with contact trip nail guns] is inconsequential and any supposed savings is far outweighed by the risks inherent in the design of a contact trip nail gun, resulting in the high probability of unintended discharge of a nail." To buttress this claim, Ezra highlighted a study comparing the time it took to apply plywood sheets to roofs using a contact trip nail gun versus a sequential trip. Ezra then calculated the cost savings "using the union carpenter wage applicable in the St. Louis area in 2006." Ezra concluded that the ultimate cost savings were "inconsequential."

Thus, Plaintiffs have produced some evidence that, in terms of utility, the contact trip may not be all that it's cracked up to be. *Cf. McMahon*, 150 F.3d at 659 (affirming summary judgment in IPLA claim against coffee maker manufacturer; "without evidence that a holding temperature of 180 [degrees] F is of little worth to consumers, plaintiffs cannot show that the choice of a high temperature makes coffee defective."). Ultimately, the Court finds that genuine issues of material fact exist as to defectiveness and unreasonable danger, thus rebutting the presumption of non-defectiveness.

### iii. Do genuine issues of material fact exist concerning proximate cause?

As a final argument, Stanley contends that Plaintiffs cannot establish proximate cause. "Whether [a plaintiff] alleges a manufacturing defect, design defect, or failure to warn, [the

plaintiff] must prove proximate causation, i.e., that the defect or missing warning proximately caused his injury." *Myers*, 2010 WL 1579676, at *3 (citations omitted). The centerpiece of Stanley's proximate cause argument is that "the undisputed evidence demonstrates that [Andrew's] injury has caused severe memory impairment, rendering [his] testimony regarding the manner in which the accident happened completely unreliable, and insufficient to establish proximate cause." In that same vein, Stanley argues that expert testimony is necessary to prove proximate cause, and Plaintiffs' causation expert, Ali Sadegh, should be excluded because his opinions are unreliable and anchored in "baseless speculation."[5] Indeed, expert testimony is typically required in product liability cases to prove causation, unless the case contains "uncomplicated facts with only one logical conclusion to be inferred therein." *Coachmen Indus., Inc.*, *v. Kemlite*, 2008 WL 4858385, at *14 (N.D. Ind. Nov. 10, 2008).

Given the circumstances, the Court is not persuaded. To reiterate, the crux of Plaintiffs' argument is that this accident never would have occurred if Andrew had been using a sequential trip nail gun because the trigger was depressed *before* the nose of the gun made contact with Andrew's chest. In terms of proximate cause, this is not a hyper-technical case. To the contrary, this is such a case with "uncomplicated facts" leading to "only one logical conclusion." *Id.* In other words, here "there is sufficient circumstantial evidence within a lay person's understanding that would constitute a basis for a legal inference and not mere speculation." *Owens v. Ford Motor Co.*, 297 F. Supp. 2d 1099, 1103 (S.D. Ind. 2003). In *Cansler v. Mills*, 765 N.E.2d 698 (Ind. Ct. App. 2002) *disapproved on other grounds*, for instance, the court found that expert testimony was not needed to find a manufacturing defect in an air bag that failed to deploy where

_____

[5] This argument is presented in full in Stanley's Motion to Exclude the testimony of Plaintiffs' Expert Ali M. Sadegh (Dkt. 52). Plaintiffs have also filed a Motion to Exclude the testimony of Defendant's expert Gary S. Deegear, M.D. (Dkt. 49).

the evidence indicated that the car was traveling 45 to 50 miles per hour at the moment of impact, the impact bent the car's frame, and the air bag was designed to deploy in frontal collisions at speeds greater than nine to fifteen miles per hour. *Id*. at 706. The same common sense reasoning applies with similar force here.

Therefore, if Plaintiffs can create genuine issues of material fact concerning whether the trigger was depressed before the gun made contact with Andrew's chest, this will suffice for purposes of surviving summary judgment. First and foremost, Plaintiffs have produced evidence suggesting that a sequential trip altogether *eliminates* the risk of inadvertent discharge. This alone is probably enough to create issues of fact concerning proximate cause. But Plaintiffs can also point to Andrew's recollection of events. As Plaintiffs note, "[w]ith or without expert testimony, from [Andrew's] testimony coupled with the typical result of how the hazard causes injury, a reasonable jury could find that the sequential trip would have prevented firing a nail into his chest." And although Andrew certainly may have problems recalling the incident, his memory and mental faculties are credibility issues to be explored at trial; they are not conducive to rulings as a matter of law at the summary judgment stage. Because genuine issues of fact exist regarding proximate cause, Stanley's Motion for Summary Judgment is **DENIED** with respect to Plaintiffs' design defect claim premised on the theory that the nail gun at issue used a contact trip as opposed to a sequential trip.

## 2. Lack of trigger guard or safety lockout

Plaintiffs also argue that the nail gun's lack of trigger guard and/or lack of a safety lockout render it defective and unreasonably dangerous. Again, the Court reiterates that Stanley is entitled to a rebuttable presumption of non-defectiveness. Plaintiffs do not attack this presumption head-on; instead, they rely on an array of statements that a trigger guard or a safety

lockout would merely make the nail gun safer. For instance, Plaintiffs' expert, Ezra, opined in his initial report that "the use of a trigger guard could have reduced the probability of unintended depression of the trigger of the nail gun." In a supplemental report, Ezra opines that "had a trigger lock been incorporated into the subject nail gun, it would have afforded Mr. Runge a safe work environment, by rendering the nail gun safe to walk with while moving from one area to another, without needing to disconnect the air line and carry it separately from the nail gun." In that same report, Mr. Ezra cites to a memorandum from the Consumer Product Safety Commission discussing the efficacy of these safety mechanisms: "Staff believes that there are several option[s] for preventing accidental depression of the trigger that range from a trigger guard to a lock-out setting on the trigger or a double action trigger." Finally, Plaintiffs' warnings expert, Michael Wogalter, observed at his deposition "that there is no trigger guard or safety lockout mechanism."

Plaintiffs' evidence is important for what it does *not* say. Specifically, none of Plaintiffs' evidence directly states that the nail gun's lack of a trigger guard or lockout mechanism renders it defective or unreasonably dangerous. Without such evidence, the Court finds that the applicable presumption simply cannot be rebutted. Moreover, it is difficult to conceptualize how the lack of a trigger guard or safety lockout renders the nail gun *unreasonably dangerous*, i.e., that it presents a "risk of physical harm to an extent beyond that contemplated by the ordinary consumer who purchases the product with the ordinary knowledge about the product's characteristics." Ind. Code § 34-6-2-146. An ordinary user of the nail gun at issue would be cognizant of its lack of a trigger guard and safety lockout. Therefore, the user would know that he had to rely on the disconnection of the air hose to function as a safety mechanism. As discussed above, disconnecting the nail gun from the air hose has the effect of turning off the

gun, meaning it cannot discharge any nails in this state. This is precisely why the owner's manual admonished users to "[a]lways disconnect air supply … when moving to a different work area, as accidental actuation may occur, possibly causing injury."

This is in noticeable contrast to the contact trip versus sequential trip situation, where the user may have a general appreciation for the differences in firing mechanisms but does not appreciate the nature and extent of the risk specifically presented by the contact trip. In the end, the Court finds Plaintiffs' evidence relating to trigger guards and/or safety lockouts inadequate to show "unreasonable danger" and overcome the rebuttable presumption. Therefore, summary judgment is **GRANTED** on Plaintiffs' defective design claim relating to trigger guards and/or safety lockouts.

**B.    Failure to warn**

A product is defective under a theory of failure to warn if the seller fails to: "(1) properly package or label the product to give reasonable warnings of danger about the product; or (2) give reasonably complete instructions on proper use of the product." Ind. Code § 34-20-4-2. Like defective design claims, inadequate warning claims are also subject to a negligence standard: "in an action based on … an alleged failure to provide adequate warnings or instructions regarding the use of the product, the party making the claim must establish that the manufacturer or seller failed to exercise reasonable care under the circumstances in … providing the warnings or instructions." Ind. Code § 34-20-2-2. And, again, Plaintiffs must show that the missing or defective warning was a proximate cause of the injuries. *Myers*, 2010 WL 1579676, at *3 (citations omitted).

With respect to proximate cause, Indiana has recognized the "read and heed" presumption, which presumes that in a failure to warn case, the injured person would have "read

and obeyed" the warning had it been given. *Kovach v. Caligor Midwest*, 913 N.E.2d 193, 199 (Ind. 2009). Here, however, there is a fundamental problem with Plaintiffs' failure to warn claim. Significantly, Plaintiffs have not provided real evidence of what additional or alternative warnings were needed, as no specific additional or alternative warnings were proposed. Under these circumstances, the jury would be left to speculate about what, if any, warnings could have prevented Andrew's accident. *See Phillips v. The Raymond Corp.*, 2006 WL 1156375, at *8 (N.D. Ill. April 25, 2006) (granting summary judgment on failure to warn claim where plaintiff failed "to suggest a different warning that would be adequate or even better … and has failed to identify a warning that would have caused him to have acted differently or would allegedly have prevented the injury he suffered").

Unfortunately, in their response brief, Plaintiffs did little to assuage the Court's concerns. Curiously, they devoted much of their brief to arguing that no set of warnings would *ever* suffice for this particular nail gun: "In other words, there are reasonable, practical, and effective means to reduce, if not eliminate the hazard such that … warning shouldn't be utilized." As Stanley notes, "it appears that Plaintiff has effectively abandoned his claim of inadequate warnings since no adequate warning is possible." The Court agrees, and for this reason, **GRANTS** summary judgment on Plaintiffs' failure to warn claim.

## V. <u>CONCLUSION</u>

Tragically, while using a nail gun, Andrew Runge tripped, fell on the gun, and suffered life-altering injuries. In the Court's view, one of Plaintiffs' claims is suitable for trial while the others are properly disposed on summary judgment. Specifically, Stanley's Motion for Summary Judgment (Dkt. 54) is **DENIED** with respect to Plaintiffs' defective design claim premised on the fact that Stanley employed a contact trip as opposed to a sequential trip.

Summary Judgment is **GRANTED** on all remaining claims. In making its ruling, the Court addressed the following evidentiary orders: first, Plaintiffs' Motion to Permit Use of Deposition Testimony taken in previous actions to the same extent as if the depositions had been taken in this action (Dkt. 66) is **GRANTED**; and, second, Defendant's Motion to Supplement the Summary Judgment Record (Dkt. 118) is **GRANTED**. Two motions remain pending in this matter: (1) Defendant's Motion to Exclude the Testimony of Plaintiffs' Expert Ali M. Sadegh (Dkt. 52); (2) Plaintiffs' Motion to Exclude the Testimony of Defendant's Expert Gary S. Deegear, M.D. (Dkt. 49). The Court will address these motions in short course as the trial date approaches.

      SO ORDERED.

Date: <u>  12/23/2011       </u>

                                         Hon. Tanya Walton Pratt, Judge
                                         United States District Court
                                         Southern District of Indiana

DISTRIBUTION:

John D. Boren
BOREN OLIVER & COFFEY
johnboren@boclawyers.com

John Scott Callahan
scott@scottcallahanattorney.com

David L. Coffman
LEWIS RICE & FINGERSH, L.C.
dcoffman@lewisrice.com

Carine Marie Doyle
LEWIS RICE & FINGERSH L.C.
cdoyle@lewisrice.com

Richard T. Mullineaux
KIGHTLINGER & GRAY, LLP
rmullineaux@k-glaw.com, sstewart@k-glaw.com

Stephen A. Oliver
BOREN OLIVER & COFFEY
steveoliver@boclawyers.com